***********
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Young and the briefs and oral arguments before the Full Commission. The appealing party has shown good ground to reconsider the evidence in this matter. Having reconsidered the evidence, the Full Commission reverses the Deputy Commissioner in its denial of benefits and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered by the parties at the hearing as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employment relationship existed between the plaintiff and defendant at all relevant times herein.
3. Defendant was a duly qualified self-insured at all times relevant herein with The Phoenix Fund as its servicing agent.
4. The parties stipulated to plaintiff's medical records from Neuroscience Spine Center of the Carolinas, P.A., Gaston Medical Group, Nalle Clinic and Gaston Internal Medicine Clinic, P.A.
5. The following documents were stipulated into evidence:
a) An Industrial Commission Form 22 dated May 15, 2000;
 b) Seventeen pages of medical records from Dr. Douglas Marlow of Gaston Medical Group, Gastonia, North Carolina; and
 c) Nine pages of medical records from Dr. Steven K. Gudeman of Neuroscience Spine Center of the Carolinas, P.A., Gastonia, North Carolina.
 ***********
Based upon all the competent evidence of record and the reasonable inferences flowing therefrom, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. Reba Bare lives in Gastonia, North Carolina, with her husband, a pastor for a local church. Ms. Bare has a high school diploma and has taken the necessary college courses to receive her certification as a day care administrator in North Carolina. Ms. Bare was first employed by her father-in-law as the secretary for his construction business for four years. She then went to work for Central Cathedral Church of God as a day care teacher in Randleman, North Carolina, where she stayed for two years. She next worked for South Concord Church of God as a day care teacher for four years.
2. In 1998, Ms. Bare was hired as a day care teacher by Cline Learning Center in Belmont, North Carolina. She worked as a teacher for a period of time and was then promoted to the administrative position of director for the Belmont facility. She was given the responsibility for hiring and firing staff for the facility, maintaining records, supervising the teaching staff and filling in for absent staff when necessary. During her tenure as director, Ms. Bare received praise from the Clines and was given a raise to reward her exemplary performance. At no time prior to her accident on January 28, 2000, was Ms. Bare ever given a warning, either verbal or written, regarding her job performance. At no time prior to her accident was there ever even a discussion about Ms. Bare's job performance. Instead, the Clines considered her work to be completely acceptable and even held her performance out as an example of how they hoped their new director in Dallas would perform.
3. On January 28, 2000, Ms. Bare was cleaning the facility late in the day. The recent weather had included snow and ice and there was still ice on the ground in the area. Ms. Bare was carrying two large bags of trash when she stepped out the back door onto a small stoop covered with ice and quite slippery. Her right leg slipped backwards as she fell forward onto the bags of trash and she executed what her doctor described as a "split." Ms. Bare stated that she knew at that moment that she had injured her back. She carried the trash out and then went back into the facility and called the other site director, Tina Alexander, and told her about the fall and the injury. Ms. Alexander stated that she would tell Mr. Cline as soon as she saw him. Ms. Bare did not call the Clines at that time because both she and Ms. Alexander were under the impression that the Clines were out of town. Ms. Bare then concluded her duties and went home.
4. Over the weekend Ms. Bare stayed either in the bed or in a recliner. Her pain was severe enough that she did not attend her husband's church service on Sunday. On Monday, however, she felt well enough to go to work. At work, she then called Ms. Cline and told her about the injury. Ms. Bare was told by Ms. Cline to go to the doctor, although no specific doctor was mentioned, and was told that a report needed to be filed. Ms. Bare was not told to file the report herself and in fact had never filed the workers' compensation injury reports before, had never been instructed how to do that and did not know the procedure. She believed that the report would be filed by either Ms. Cline or Mr. Cline. Ms. Bare continued to work that week although she was in pain. She felt she was getting better and simply took it easy, deferring the more strenuous tasks to others.
5. On February 2, 2000, Ms. Bare had a previously scheduled appointment with her family physician, Dr. Douglas Marlow, to follow up with her hypertension treatment. At that time, she did not discuss her injury with Dr. Marlow because she thought she was improving and the appointment was only for her blood pressure. She also picked up a medical form required by the State that had been left with Dr. Marlow on a previous visit. The purpose of the form was to certify that an employee was physically capable of working with children. Ms. Bare noted that the form was completed by the doctor based upon a previous visit.
6. On the following weekend, Ms. Bare was scheduled to attend a day care teacher workshop at Gaston College in Dallas, North Carolina. She was in severe pain that morning but went to the workshop anyway. However, she was only able to stay about thirty minutes before she had to leave. Upon arriving home, she was taken to the emergency room at the hospital where she was examined and given medication for pain.
7. The following week Ms. Bare went to her family doctor where she was examined by the physician's assistant, who ordered x-rays. The physician's assistant felt that she had degenerative disc disease and prescribed medication for her. However, after she did not improve, Ms. Bare returned to her doctor and was seen by him. Dr. Marlow ordered an MRI scan which showed a herniated disc at L4-5 and a bulging disc at L5-S 1. Dr. Marlow then referred Ms. Bare to Dr. Steven Gudeman, a neurosurgeon.
8. Dr. Gudeman reviewed the MRI scan and determined that surgery was necessary due to the neurological changes he observed on examination. She had a positive straight leg raising test on the right limited to about 30 degrees. He also found that she had atrophied muscles in her right calf and decreased neurological sensation in her right foot as well as decreased strength upon dorsi-flexion. Dr. Gudeman scheduled her surgery for March 7, 2000.
9. The day before the surgery, Ms. Bare received notification that her claim was being denied. The reasons given included a lack of credibility, no medical evidence that her condition was related to her employment, and no evidence that her injury was caused by her fall, despite the medical records from Dr. Marlow and Dr. Gudeman to the contrary. Ms. Bare elected to have her surgery anyway.
10. Following her surgery, Ms. Bare had considerable improvement initially. Her pain was greatly reduced. She completed a course of physical therapy and was released to return to work in May of 2000. She notified the Clines that she was ready to return to work and was told to wait a week so that they could meet with her. On May 24, 2000, the Clines informed Ms. Bare that her old job was no longer available and that she could come back as a teacher at a reduced wage for forty hours a week. Ms. Bare told the Clines that she needed to think about the offer and talk to her doctor and that she would let them know after the weekend. However, before she was given an opportunity to accept or decline the offer, the Clines told Ms. Bare that she was fired. Defendant had no thought of firing plaintiff until after she suffered her compensable injury. The "reasons" for her firing were never discussed with her. The Full Commission finds the reasons expressed at the hearing before the Deputy Commissioner to be an after-the-fact pretext.
11. Ms. Bare did not work again until she obtained a day care teaching position in August of 2000.
12. Ms. Bare did not return to the doctor until June 28, 2001, when she saw Dr. Marlow for pain and depression. Dr. Marlow prescribed anti-depressants for her depression. She returned in six weeks with a marked improvement in her depression symptoms. Ms. Bare returned to Dr. Gudeman in August 13, 2001, with recurrent back symptoms. Dr. Gudeman examined her and ordered a second MRI, which did not show further herniations. He released her with no restrictions. Dr. Gudeman assigned a ten percent disability rating to her back.
13. To the date of the hearing before the Deputy Commissioner, Ms. Bare has not returned to work other than the two months she attempted to work at the day care center in Gastonia. She continues to have significant back pain on a daily basis.
14. Don Anderson and William Shafer, licensed investigators, testified that on July 18-19, 2001 and August 12-13, 2001, they observed and videotaped the plaintiff performing several activities including weeding her flowerbeds by bending over for approximately 10 to 15 minutes. The plaintiff carried her own shopping bags from Food Lion and unloaded her mini-van without assistance. The Full Commission does not find this evidence to indicate wage-earning ability, nor does it abrogate medical testimony concerning her condition. The two surveillance reports purporting to show that Ms. Bare was not in pain could not in fact show that. Neither of the investigators spoke with Ms. Bare. Neither was a medical doctor. Neither ever spent more than a short period of time observing Ms. Bare. They did not go into her home to see if she was lying down. They had no way of knowing if she had taken pain medication to enable her to engage in outside activities temporarily. All the investigators saw was Ms. Bare driving her vehicle, riding as a passenger in a vehicle, spending twenty minutes in a grocery store, caring for her grandchild, attending a church function and going to get her mail from the mailbox. The investigators only spent a total of four days out of a period of two years watching Ms. Bare to make their "expert" determination that she was not in pain. In reality, there is no way that either of the investigators could know if Ms. Bare was feeling pain. They did not report her performing any activity that she did not state under oath that she was capable of doing. They had no way of knowing under what circumstances Ms. Bare was engaging in these activities, i.e., rest breaks, medications, etc. In fact, they only observed Ms. Bare performing activities that she testified she was capable of doing.
15. Plaintiff continued to receive her full salary from defendant for approximately one month following her January 28, 2000, compensable injury at a bi-weekly rate of $800.00. Plaintiff's average weekly wage was $400.00, which yields a compensation wage of $266.67 per week.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Until January 28, 2000, Ms. Bare was totally capable of performing all the duties required of her. She did not have any physical limitations that prevented her from freely performing all that was required of her. After January 28, 2000, when she slipped and nearly fell on the steps outside the facility, Ms. Bare experienced severe pain. She managed to work one week, but was unable to do all of her work, instead staying in the office and sitting down. She admitted that she should have been out in the childcare area more, but just could not with her pain levels. After that week, Ms. Bare was unable to continue and did not return to work because of the pain. She went to her doctor who shortly thereafter referred her to a neurosurgeon. After reviewing an MRI scan, the neurosurgeon found a herniated disc and a bulging disc in Ms. Bare's lower back, both of which are likely to cause severe pain. In addition, Dr. Gudeman noted that Ms. Bare had several neurological changes such as decreased strength and sensation in her right leg as well as atrophied muscles in her right calf. She had a positive straight leg raising test which indicated neurological damage. Just as there can be no question of medical evidence to show that Ms. Bare had a severe injury there is no evidence to indicate that she had this injury prior to January 28, 2000. Ms. Bare described an accident in which she immediately felt the injury occur. Dr. Gudeman testified, and the Full Commission finds as fact, that the accident Ms. Bare described on January 28, 2000 was "the cause, the direct cause, of her pain and the herniated disc which was causing the pain." There has been no evidence to indicate that the accident did not arise out of or in the course of Ms. Bare's employment with the defendant. As such, Ms. Bare has provided adequate evidence to show that she suffered a compensable injury by accident on January 28, 2000. Plaintiff sustained an injury by accident arising out of and in the course of her employment with the defendant on January 28, 2000. N.C. Gen. Stat. § 97-2(6).
2. Ms. Bare last worked for the defendant on February 4, 2000, after which she was out of work due to pain and recovery from her surgery until May of 2000 when she was released by Dr. Gudeman to return to work on a limited basis with restrictions. However, instead of allowing Ms. Bare to return to her job, defendant chose instead to terminate her employment for alleged misconduct on her job. As a result, Ms. Bare continued to be out of work until she obtained other employment in August of 2000 as a day care teacher making $7.00 per hour.
3. Ms. Bare testified, and the Full Commission finds as fact, that her pain level, on a daily basis, was constant. She had to rely on pain medication and had to take frequent breaks to rest. She could be up for three to four hours but then had to sit down or lie down and rest. She could stand for about five minutes, could walk or sit for about an hour before she has to rest. She had leg cramps and pain in her right leg and weakness in her right ankle. Although not compensable in and of itself, pain is a factor which must be considered when judging disability.Matthews v. Petroleum Tank Service, Inc., 108 N.C. App. at 535,
423 S.E.2d at 265 (1992), Webb v. Power Circuit, Inc., 141 N.C. App. 507,540 S.E.2d 790 (2000). The only person who can accurately determine pain is the person experiencing it. Matthews at 108 N.C. App. 259, 266,423 S.E.2d 532, 536 (1992); Webb v. Power Circuit, Inc., 141 N.C. App. 507,540 S.E.2d 790 (2000). There are no definitive tests for pain, nor are there any sure ways to determine if a person is feeling pain. Ms. Bare's own testimony regarding her pain is corroborated by both of the doctors deposed in this case. Dr. Gudeman testified that Ms. Bare's injury had the potential to cause the symptoms of which she complained. He also found that it was possible that she could not work due to her pain, even though he felt that she could possibly do her past work with the proper mechanics. Dr. Marlow also testified that Ms. Bare's injury had the potential to cause the symptoms she described. He stated that in his opinion it would be very difficult for her to do her past work. Both doctors testified that Ms. Bare likely had the pain she described and that the pain was the result of her injury. Dr. Marlow testified that she would have a difficult time performing her past work given her pain levels. He stated that although her pain had improved after surgery, it was not gone. There is ample evidence in the record to prove that Ms. Bare was disabled pursuant to N.C. Gen. Stat. § 97-29. Therefore, Ms. Bare is entitled to temporary total disability compensation from the time that she became unable to continue working on February 4, 2000, until August 28, 2000, when she obtained another job. N.C. Gen. Stat. § 97-29.
4. Ms. Bare is entitled to medical compensation for her compensable injury, not including treatment for her depression which pre-existed her compensable injury. Pursuant to N.C. Gen. Stat. § 97-2(19), medical compensation is payable for treatment "as may reasonably be required to effect a cure or give relief and for such additional time as, in the judgment of the Commission, will tend to lessen the period of disability". Ms. Bare is in need of further medical treatment in the form of pain management. Ms. Bare was referred to Dr. Chris Covington, a doctor who specializes in pain management, but Ms. Bare has not been to him yet. N.C. Gen. Stat. § 97-2(19).
 ***********
Based upon the foregoing Findings of Facts and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Subject to the attorney fees hereafter awarded, defendant shall pay to plaintiff compensation at the rate of $266.67 per week from March 4, 2000, through August 28, 2000. The March 4 date gives credit to defendant for wages paid for the month following plaintiff's last workday of February 4, 2000. This amount has accrued and shall be paid in a lump sum, with interest at 8 percent per year from August 2, 2001, until paid. Defendant shall pay all of the interest to plaintiff. Defendant shall pay 25% of the lump sum compensation directly to plaintiff's attorney.
2. Subject to the attorney fees hereafter awarded, defendant shall pay to plaintiff compensation at the rate of $266.67 per week for 30 weeks for the 10 percent back rating given by Dr. Gudeman. This amount has accrued and shall be paid in a lump sum, with interest at 8 percent per year from August 2, 2002, until paid. Defendant shall pay all of the interest to plaintiff. Defendant shall pay 25% of the lump sum compensation directly to plaintiff's attorney.
3. Defendant shall pay for or reimburse all medical treatment for plaintiff's compensable injury that was reasonably necessary to effect a cure, lessen the period of disability or relieve pain." Defendant shall also provide further medical treatment in the form of pain management. Ms. Bare was referred to Dr. Chris Covington, a doctor who specializes in pain management, and defendant shall provide this care as necessary to relieve pain.
4. Defendant shall pay the costs.
This 21st day of April 2003.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/____________ BUCK LATTIMORE CHAIRMAN